UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

CHLOE DABIT,

        Plaintiff,
v.

ALTERNATIVE SUPPORT, INC.,

        Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff, Chloe Dabit, by and through her attorneys, HKM Employment Attorneys, LLP, for her Complaint & Jury Demand against Alternative Support, Inc. ("Defendant" or the "Company") states and alleges as follows:

### PRELIMINARY STATEMENT

1. This is an employment discrimination case arising from Defendant's discrimination toward and wrongful termination of Plaintiff because of her actual and/or perceived disability, Ehlers-Danlos Syndrome. Defendant, a company that serves disabled clients, suddenly put Plaintiff on indefinite, unpaid leave on December 19, 2018, within hours of Plaintiff reporting her concerns of being discriminated against on the basis of her disability. Defendant then performed a targeted investigation to try to justify its decision to terminate Plaintiff because of her actual and/or perceived disability, and/or in retaliation for engaging in protected activity under the Americans with Disabilities Act, as amended ("ADA"). On or about January 14, 2019, Defendant

terminated Plaintiff, telling her "we no longer need your services."

## PARTIES

2. At all times relevant to this Complaint, Plaintiff is and was a resident of Colorado.

3. Defendant Alternative Support, Inc. is a Colorado corporation with a principal place of business located at 8933 East Union Avenue, Suite 212, Greenwood Village, Colorado 80111.

## JURISDICTION AND VENUE

4. Plaintiff incorporates by reference the above paragraphs as though set forth separately and fully herein.

5. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

7. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

8. Plaintiff filed her Charge of Discrimination Numbers 32A-2019-00603 and FE2019765719 with the Equal Employment Opportunity Commission ("EEOC") and the Colorado Civil Rights Division ("CCRD"), respectively, for disability discrimination and retaliation on or about June 13, 2019. Plaintiff was issued a Notice of Right to Sue from the EEOC on April 8, 2020 and has initiated the present action within ninety (90) days of receipt of same.

9. Plaintiff has met all administrative prerequisites prior to filing this action.

**FACTUAL ALLEGATIONS**

10. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

11. Defendant provides services to individuals with emotional, learning and developmental disabilities.

12. Plaintiff is an individual with a disability, in that Plaintiff suffers from Ehlers-Danlos Syndrome ("EDS"). Without ameliorative devices, Plaintiff's EDS substantially limits one or more major life activities, including the operation of Plaintiff's musculoskeletal system. As a result of Plaintiff's EDS, her joints are double-joined and the connective tissue is incredibly loose, resulting in recurrent, painful dislocations. Plaintiff's EDS has resulted in the vast majority of Plaintiff's vertebrae being fused together in her spine, as well as five knee surgeries.

13. Plaintiff began working for Defendant in or around April 2018 as a Potter/Website Developer/Social Media Director.

14. At all times during her employment with Defendant, Plaintiff met or exceeded her employer's legitimate performance expectations. For example, in or around October 2018, Defendant opened a second location and, as a result of Plaintiff's exceptional work for the Company, Plaintiff earned a promotion as the Manager of the new location.

15. Around the time of her hire, Plaintiff disclosed her EDS to Defendant and told Defendant that she would have physical limitations associated with her EDS and at times need time off from work related to medical appointments and procedures. Plaintiff also offered to provide Defendant with her function test report to detail the limitations associated with her EDS.

16. Defendant initially expressed a willingness to accommodate Plaintiff.

17. However, in approximately November 2018, Plaintiff started noticing negativity from management when she requested time off for her medical appointments and procedures related to her EDS. Management also began expressing negative views of Plaintiff's EDS, and her need for accommodation related to same.

18. For example, on one occasion, management asked Plaintiff to move tables and chairs into the building that were dropped off outside of Defendant's new location. Plaintiff had to remind a supervisor, Janette Hazlinsky, Defendant's Program Coordinator, that she was substantially limited in her ability to lift these items due to her high risk of injury. Ms. Hazlinsky eventually came to the location to move the tables and chairs into the building, though she was noticeably irritated about Plaintiff's request and need for accommodation. Ms. Hazlinsky snapped at Plaintiff, "These things aren't even that heavy." Plaintiff had to explain that, though the tables and chairs might not be heavy for her, they were heavy and dangerous for Plaintiff due to her EDS.

19. On another occasion in early December 2018, Plaintiff had to request assistance from management to move an uninstalled door that had been leaning up against a wall in the Company's new location. When Plaintiff requested assistance moving the door, Ms. Hazlinsky acted as if she did not believe Plaintiff and asked in an irritated tone, "Really? How heavy is it?"

20. On or about December 4, 2018, management suddenly told Plaintiff that she would now be required to fill out a leave request form for every medical appointment and procedure she attended and/or underwent. With the exception of a knee surgery Plaintiff underwent on or about June 15, 2018 that required five days of leave from work, management had not required Plaintiff to submit leave request forms or provide other medical documentation during the eight months she had been working for the Company.

21. As instructed, Plaintiff started filling out and submitting leave request forms for every doctor's appointment she attended and/or procedure she underwent related to her EDS.

22. For example, on December 6, 2018, Plaintiff filled out a leave request form and requested the reasonable accommodation of leave from work between December 21, 2018 through December 23, 2018 to undergo a procedure involving nerve block sedation.

23. The same day, on December 6, 2018, Plaintiff filled out another leave request form requesting the reasonable accommodation of being allowed to miss work on January 2, 2019 for a bone density scan, x-rays, and an MRI.

24. On December 19, 2018, two days before Plaintiff's spinal fusion block procedure, Ms. Hazlinsky came to visit Plaintiff at her studio. Plaintiff asked Ms. Hazlinsky what information Defendant would need her to provide for her upcoming procedure. Plaintiff explained she was confused whether Defendant needed a doctor's note regarding any limitations after her upcoming procedure, or information regarding all of her physical limitations associated with her EDS. Plaintiff repeatedly said she was happy to provide any necessary information but that, given the large amount of medical information associated with her EDS, she wanted to be clear about what information was necessary to provide.

25. Ms. Hazlinsky told Plaintiff, "We need all of it. We need all your limitations, everything you can and can't do." Plaintiff was confused and asked why Defendant needed that breadth of information after she had been working at the Company approximately eight months. Plaintiff also told Ms. Hazlinsky that she believed she had previously provided her function report that sets out her physical limitations. Ms. Hazlinsky could not or would not specify what information was missing that Plaintiff had not previously provided, she simply continued to ask

for "all of your disability information." Ms. Hazlinsky told Plaintiff that Defendant needed "all of your disability information," because they purportedly "needed it for workers' compensation and the State's coming in. It was overlooked when you were hired, and we need to go over it. Don't worry, this is just for the State." Plaintiff requested that Ms. Hazlinsky check on whether Defendant had her function report and let her know what else she needed to provide to fill in any gaps.

26. Due to Ms. Hazlinsky and management's changed scrutiny toward Plaintiff's EDS and accommodations she requested related to her EDS, Plaintiff also engaged in the protected activity of telling Ms. Hazlinsky that she believed Defendant was engaging in disability discrimination by imposing new requirements and requesting that she provide Defendant with all information related to her disability.

27. Ms. Hazlinsky reacted defensively to Plaintiff's report of discrimination and explained again that Defendant purportedly needed all of her documentation related to her disability to comply with workers' compensation requirements. Plaintiff never received further clarification regarding what documentation Defendant was missing and needed, or why "all of her disability information" was needed.

28. Within hours of making a reasonable report of disability discrimination, Plaintiff received a text message asking her to go to the main office to meet with Shraddha Kharel, Defendant's Assistant Director.

29. At this time, Ms. Hazlinsky was Plaintiff's direct supervisor. Ms. Kharel was Ms. Hazlinsky's supervisor.

30. At the meeting, Ms. Kharel asked Plaintiff if she liked her job. Plaintiff asked why

Ms. Kharel was asking her that question, and Ms. Kharel explained that she had purportedly "had a bad attitude" during her meeting with Ms. Hazlinsky that same day, the meeting during which Plaintiff reported that she believed she was being discriminated against based on her disability.

31. Ms. Kharel told Plaintiff that Ms. Hazlinsky had felt threatened with the way Plaintiff was asking about what additional information Defendant needed concerning Plaintiff's disability. Ms. Kharel then told Plaintiff that her time off work related to her EDS was becoming, to the Company, "an attendance issue." Ms. Kharel said, "I'll just say that you've missed a lot of work, even though it's all medical, it's a lot of work."

32. In other words, Defendant was penalizing Plaintiff for making a report of discrimination, as well as for requesting and using accommodations related to her EDS.

33. Ms. Kharel then claimed that the Company had purportedly received complaints about Plaintiff being "unapproachable." When Plaintiff asked for details regarding the complaints, Ms. Kharel refused to give any specifics. Ms. Kharel then said that this had nothing to do with Plaintiff's performance, but because she was supposedly "so unapproachable," management had decided to put Plaintiff on an indefinite unpaid suspension.

34. Plaintiff was then given a "Corrective Memo" that blatantly stated that Plaintiff's indefinite suspension from work was because Plaintiff "became visibly upset and started questioning company's position regarding the request made" for "all documentation" related to her disability. The Corrective Memo went on to say: "You stated that you had already provided the paperwork regarding your current medical limitations to the Assistant Director, prior to your start date which is not true. You only verbally stated your restriction during the interview. … You have continued to become non-approachable [sic] and difficult to interact with, due to your

7

negative demeanor."

35. In other words, Defendant conceded that its decision to place Plaintiff on indefinite unpaid suspension was due to her concerns of discrimination expressed only hours earlier. Notably, Defendant never contended that Plaintiff refused to provide medical documentation requested by Defendant.

36. Ms. Kharel told Plaintiff that she would hear back from Defendant about whether it would allow her to return to work following her discriminatory suspension by December 28, 2018.

37. Plaintiff did not hear back from Defendant by that date.

38. On January 7, 2019, Plaintiff reached out to Defendant and was, again, told that she was on an indefinite unpaid suspension and that she would hear back from the Company if she was allowed to return to work.

39. In the Position Statement Defendant submitted to the CCRD, Defendant included a termination letter from Ms. Kharel to Plaintiff dated January 14, 2019. The letter stated: "I regret to inform you that we no longer need your services as a Potter at Alternative Support Pottery Studio; effective immediately."

40. Defendant's Position Statement submitted to the CCRD also shows that, after Plaintiff was put on indefinite unpaid leave, Defendant performed an investigation targeting Plaintiff in further retaliation for her protected activity and for the purpose of trying to legitimize its decision to terminate her employment.

41. In contrast, upon information and belief, Defendant did not perform any investigation concerning Plaintiff's report of discrimination.

## FIRST CLAIM FOR RELIEF
### (Disability Discrimination and Impermissible Medical Inquiry in Violation of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12112(a) and (d)(4)(A))

42. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

43. Plaintiff is a disabled person within the meaning of the ADA.

44. Plaintiff's EDS is a physical impairment which, without ameliorative devices, substantially limits one or more major life activities as compared to the general population. For example, Plaintiff's EDS substantially limits Plaintiff's ability to lift objects as compared to the general population. When active, Plaintiff's EDS also affects the operation of her musculoskeletal system, exposing Plaintiff to a high risk of recurring, painful dislocations.

45. Though Plaintiff suffered from a disabling medical condition at the time of her termination, Plaintiff was qualified for her job and capable of performing the essential functions of her position with reasonable accommodations.

46. At the time of Plaintiff's termination, Plaintiff was also regarded as being disabled by Defendant.

47. Defendant perceived Plaintiff as being substantially limited in her ability to work due to her EDS, when Plaintiff was not so limited.

48. Defendant discriminated against Plaintiff because of her actual and/or perceived disability by subjecting her to an impermissible medical inquiry, placing her on an indefinite unpaid suspension, and terminating Plaintiff's employment, in violation of the ADA.

49. Defendant's request for "all of [Plaintiff's] disability information" constituted an impermissible medical inquiry as to the nature and severity of Plaintiff's disability that was neither

job-related nor consistent with business necessity. Defendant placed Plaintiff on an indefinite and unpaid suspension, and terminated her employment, due to Plaintiff's responses to Defendant's impermissible medical inquiry and/or Plaintiff's complaint regarding same.

50. The effect of Defendant's discriminatory practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of her actual and/or perceived disability, and/or Defendant's impermissible medical inquiries concerning the severity and nature of Plaintiff's actual and/or perceived disability.

51. Defendant's above-described conduct was intentional.

52. Defendant's above-described conduct was done with malice or reckless indifference to Plaintiff's federally protected rights.

53. As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

## SECOND CLAIM FOR RELIEF
**(Retaliation in Violation of the ADA, as amended, 42 U.S.C. § 12203(a))**

54. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

55. Mere hours before Plaintiff was put on indefinite unpaid suspension, Plaintiff told Defendant that she believed Defendant was engaging in disability discrimination by imposing new requirements concerning her requests for accommodation related to her disability and requesting that she provide Defendant with all information related to her disability. In doing so, Plaintiff was engaging in activity protected under the ADA.

56. Plaintiff additionally made multiple requests for reasonable accommodations related to her disability during her employment with Defendant. Specifically, on December 6, 2018, Plaintiff requested the accommodation of being allowed to take modest leave from work between December 21, 2018 through December 23, 2018 to undergo a procedure involving nerve block sedation. On the same day, Plaintiff requested the reasonable accommodation of being allowed to miss work on January 2, 2019 for a bone density scan, x-rays, and an MRI. In making these requests, Plaintiff was engaging in activity protected under the ADA.

57. Defendant retaliated against Plaintiff after she engaged in the above-described protected activity by putting her on an indefinite and unpaid suspension, performing a targeted investigation to attempt to uncover purported misconduct, and by terminating her employment. These are consequences that would tend to discourage similarly situated employees from requesting accommodations related to a protected medical condition, and that would similarly tend to chill reasonable reports of violations of the ADA. For example, mere hours after Plaintiff's protected report of discrimination, Defendant put Plaintiff on an indefinite unpaid leave for her purported "negative demeanor."

58. Defendant's above-described conduct was intentional.

59. Defendant's above-described conduct was done with malice or with reckless indifference to Plaintiff's federally protected rights.

60. As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience, and she is entitled to such general and special damages, economic damages, punitive damages and attorneys' fees and costs as permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendant and order the following relief as allowed by law:

A. Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, garden-variety emotional distress, pain, inconvenience, mental anguish, and loss of enjoyment of life;

B. Punitive damages for all claims as allowed by law;

C. Attorneys' fees and costs of this action;

D. Pre-judgment and post-judgment interest at the highest lawful rate; and

E. Such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 10th day of April 2020.

**HKM EMPLOYMENT ATTORNEYS LLP**

By: *s/ Shelby Woods*
Claire E. Hunter (39504)
Shelby Woods (48606)
HKM Employment Attorneys LLP
730 17th Street, Suite 750
Denver, Colorado 80202
chunter@hkm.com
swoods@hkm.com
*Attorneys for Plaintiff Chloe Dabit*